# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

BRIAN FELDMAN and DANIEL
DICKERSON, individually, and on behalf
of a class of similarly situated individuals,

      Plaintiffs,

v.                                                                    JURY DEMANDED

BRP US, INC., BOMBARDIER
RECREATIONAL PRODUCTS, INC.
and BRP, INC.,

      Defendants.

_____/

## CLASS ACTION COMPLAINT
## AND JURY TRIAL DEMAND

Plaintiffs Brian Feldman and Daniel Dickerson, individually and on behalf of all others similarly situated, file this Class Action Complaint, and allege as follows:

### INTRODUCTION

1.     The exhaust system installed in 2010 to 2016 Sea-Doo personal watercraft ("Class PWCs") suffer from a defect in material that causes, among other things, the Class PWCs' exhaust resonator to melt and the Class PWCs to take on water ("Exhaust Resonator Defect"). Although defects in material or workmanship are covered by Defendants' (1) Limited Warranty that purports to last 12 months and (2) Emission-Related Warranty that purports to last 30 months or 175 hours, whichever comes first, Defendants have failed to repair the Exhaust Resonator Defect under the applicable warranties.

2.     Defendants are aware of the Exhaust Resonator Defect and know that consumers do not anticipate that the Class PWCs exhaust system has a component that will melt under normal use and result in the Class PWCs taking on water and sinking. Nevertheless, Defendants

have not informed current owners about the Exhaust Resonator Defect, have not disclosed the Exhaust Resonator Defect to prospective purchasers, and continue to promote the Class PWCs as safe.

3.     The Class PWCs present a safety hazard and are unreasonably dangerous to consumers. When the exhaust resonator melts, water flows into the hull of the Class PWCs that results in the partial and/or complete sinking of the Class PWCs. Obviously, such a situation results in the Class PWC passengers to be stranded in whatever body of water they were operating in, and could even result in personal injury or death.

4.     In addition to these safety hazards, the cost to repair the Exhaust Resonator Defect can be exorbitant because consumers will be required to pay hundreds, if not thousands, of dollars to repair the damage to the exhaust system and any damage caused by the intake of water. Upon information and belief, the Exhaust Resonator Defect has even resulted in the total loss of some Class PWCs.

5.     On information and belief, Defendants knew or should have known that the Class PWCs and their exhaust systems are defective and not fit for their intended purpose of providing consumers with safe and reliable transportation. Nevertheless, Defendants have actively concealed and failed to disclose this defect to Plaintiffs and the Class Members at the time of purchase or thereafter.

6.     Defendants knew and concealed the Exhaust Resonator Defect that is contained in every Class PWC, along with the attendant safety concerns and associated repair costs, from Plaintiffs and Class Members both at the time of sale and repair and thereafter. Had Plaintiffs and the Class Members known about these defects at the time of sale, Plaintiffs and the Class Members would not have purchased the Class PWCs or would have paid less for them.

7.     As a result of Defendants' practices, Plaintiffs and the other members of the proposed Class, have suffered injury in fact, including economic damages, and have lost money or property. Plaintiff brings a claim for breach of express warranty, breach of implied warranty, violations of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*, statutory fraud, and unjust enrichment.

## PARTIES

### Plaintiff Brian Feldman

8.     Plaintiff Brian Feldman is a Florida citizen who resides in The Villages, Florida.

9.     On or about August 28, 2015, Mr. Feldman purchased a 2015 Sea-Doo GTI 130 SI from West Coast Power Sports, an authorized Sea-Doo retailer in Clearwater, Florida.  Mr. Feldman purchased the PWC primarily for his personal, family, or household purposes.

10.     On May 30, 2016, Mr. Feldman was operating his PWC.  While idling in a "no wake" zone, the PWC began a loud continuous beep indicating a high exhaust temperature.  Mr. Feldman turned the PWC off, waited about a minute, and then attempted to start the PWC in neutral, but it would not run for more than a few seconds before shutting down.

11.     Unbeknownst to Mr. Feldman, the exhaust resonator on his PWC had melted and was taking on water.  This resulted in Mr. Feldman's PWC sinking in a canal occupied by alligators.

12.     Mr. Feldman was ultimately able to retrieve his PWC and have it towed to West Coast Power Sports, which cost approximately $150.  The service technician inspected Mr. Feldman's PWC and confirmed that the Exhaust Resonator Defect caused the resonator to melt, as demonstrated in the picture below:



13.     Despite his PWC still being under the Limited Warranty and Emission-Related Warranty, Mr. Feldman was advised that the repairs to would not be covered under warranty and he was quoted $431.99 to repair the PWC.

14.     On or about June 11, 2016, Mr. Feldman contacted Defendants and described his experience with the Exhaust Resonator Defect and requested that it be repaired under warranty.

15.     On June 15, 2016, Defendants' employee emailed Mr. Feldman and advised that they would not cover the repairs under warranty and refused to provide further assistance.

16.     Before Mr. Feldman purchased the subject PWC, he consulted with Defendants' sales representatives and reviewed sales/marketing materials. However, at no time did the Defendants' dealer or any of the written materials on the subject PWC disclose to plaintiff that the Class PWCs suffer from the Exhaust Resonator Defect alleged herein. Had Defendants' disclosed the true nature of the Exhaust Resonator Defect alleged herein, Mr. Feldman would not have purchased the PWC or would have paid less for it.

**Plaintiff Daniel Dickerson**

17.     Plaintiff Daniel Dickerson is a New York citizen who resides in Rochester, New York.

18.     On or about June 29, 2016, Mr. Dickerson purchased two 2016 Sea-Doo GTX S155 PWCs from Filer's Powersports, an authorized Sea-Doo retailer in Macedon, New York. Mr. Dickerson purchased the PWCs primarily for his personal, family, or household purposes.

19.     On July 1, 2016, Mr. Dickerson was operating his PWCs for the first time.  While operating them, one of the PWCs sounded the high exhaust temperature warning.   Within minutes of this warning, Mr. Dickerson's PWC began to sink.

20.     Unbeknownst to Mr. Dickerson, the exhaust resonator on his PWC had melted and was taking on water.  This resulted in Mr. Dickerson's PWC sinking.

21.     Mr. Dickerson was ultimately able to retrieve his PWC and have it towed to Filer's Powersports.  The service technician inspected Mr. Dickerson's PWC and confirmed that the Exhaust Resonator Defect caused the resonator to melt, as demonstrated in the picture below:



22.     Despite his PWC having under 2 hours of use and still being under the Limited Warranty and Emission-Related Warranty, Mr. Dickerson was advised that the repairs would not be covered under warranty and he was quoted $3,512.97 to repair the PWC.

23.     Shortly thereafter, Mr. Dickerson wrote a letter to his dealer that described his experience with the Exhaust Resonator Defect and requested that it be repaired under warranty. That letter was forwarded to Defendants.

24.     On August 16, 2016, Defendants' employee emailed Mr. Dickerson and advised that it would not cover the repairs under warranty and refused to provide further assistance.

25.     Before Mr. Dickerson purchased the subject PWC, he consulted with Defendants' sales representatives and reviewed sales/marketing materials. However, at no time did the Defendants' dealer or any of the written materials on the subject PWC disclose to plaintiff that the Class PWCs suffer from the Exhaust Resonator Defect alleged herein. Had Defendants' disclosed the true nature of the Exhaust Resonator Defect alleged herein, Mr. Dickerson would not have purchased the PWC or would have paid less for it.

**Defendants**

26.     BRP US, Inc., is a corporation organized and in existence under the laws of the State of Delaware with its headquarters located in Sturtevant, Wisconsin. At all times relevant herein, BRP US, Inc. was engaged in the business of importing, marketing, distributing, warranting, servicing, repairing and selling PWCs in Florida, New York, and throughout the United States of America.

27.     Bombardier Recreational Products, Inc., and BRP, Inc., are Canadian corporations with their corporate headquarters in Valcourt, Quebec, Canada.  BRP, Inc., owns 100% of Bombardier Recreational Products, Inc., which in turn owns 100% of BRP US, Inc.  Bombardier

Recreational Products, Inc., and BRP, Inc., design, manufacture, warrant, sell, distribute, and market PWCs in Florida, New York, and throughout the United States of America.

28.     BRP US, Inc., Bombardier Recreational Products, Inc., and BRP, Inc. (collectively referred to as "BRP"), operate as a single entity for the purposes of designing, manufacturing, importing, marketing, distributing, warranting, servicing, repairing and selling PWCs in Florida, New York, and throughout the United States of America.

## JURISDICTION AND VENUE

29.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §§1332(d)(2) and (6) of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.  All conditions precedent to filing of this action, have been satisfied or waived.

30.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391, because Defendants are subject to personal jurisdiction in this district, have advertised in this district, and has received substantial revenue and profits from their sales of Class PWCs in this district; therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this district.  Furthermore, Defendants maintain a regional office in this district.

31.     This Court has personal jurisdiction over Defendants because the specific conduct and acts giving rise to this litigation occurred in this district.   Moreover, Defendants have conducted substantial business in this judicial district, and intentionally and purposefully placed

Class PWCs into the stream of commerce within the districts of Florida and throughout the United States.

## FACTUAL ALLEGATIONS

32.      For years, Defendants have designed, manufactured, distributed, imported, warranted, marketed, advertised, serviced and sold, directly or indirectly through dealers and other retail outlets, thousands of Class PWCs throughout the United States.

33.      The Class PWCs come equipped with an exhaust system that includes an exhaust resonator.  The purpose of a resonator is to cancel out a certain range of sound frequencies.

34.      Plaintiffs and Class Members are the intended purchasers of the Class PWCs and the intended beneficiaries of Defendants' warranties relating to the Class PWCs.

35.      Plaintiffs and Class Members are retail consumers of Class PWCs, who purchased new Class PWCs at dealers authorized to distribute them in Florida, New York, and throughout the United States of America. Plaintiffs' and Class Members' Class PWCs have undergone proper registration by authorized dealers, which serve as local agents for Defendants, marketing and selling the Class PWCs and performing warranty repairs and services and processing warranty requests for Defendants, relating to the Class PWCs.

36.      Defendants provide owners of the Class PWCs with a Limited Warranty. The Limited Warranty states:

> Bombardier Recreational Products Inc. ("BRP")* warrants its model-year 2015 Sea-Doo personal watercraft sold by authorized BRP Dealers (as defined below) in the United States of America ("USA") and in Canada from defects in material or workmanship for the period and under the conditions described below.

> This limited warranty will be in effect from (1) the date of delivery to the first retail consumer or (2) the date the product is first put into use, whichever occurs first and for the applicable period below:

> 1.  TWELVE (12) CONSECUTIVE MONTHS for private use owners.

    2. FOUR (4) CONSECUTIVE MONTHS for commercial use owners. [ ].
    3. For emission-related components; please also refer to the US EPA EMISSION RELATED WARRANTY contained herein.

37. Defendants provide owners of the Class PWCs with an Emission-Related Warranty. The Emission-Related Warranty states:

> Bombardier Recreational Products Inc. ("BRP")* warrants to the ultimate purchaser and each subsequent purchaser that this new engine, including all parts of its exhaust emission control system and its evaporative emission control system, meets two conditions:
>
>     1. It is designed, built, and equipped so it conforms at the time of sale to the ultimate Purchaser with the requirements of 40 CFR 1045 and 40 CFR 1060.
>     2. It is free from defects in materials and workmanship that may keep it from meeting the requirements of 40 CFR 1045 and 40 CFR 1060.
>
> Where a warrantable condition exists, BRP will repair or replace, as it elects, any part or component with a defect in materials or workmanship that would increase the engine's emissions of any regulated pollutant within the stated warranty period at no cost to the owner, including expenses related to diagnosing and repairing or replacing emission-related parts.

The Emission-Related Warranty is valid for components such as the exhaust system and the exhaust resonator for 175 hours or 30 months, whichever occurs first.

38. The Exhaust Resonator Defect causes the plastic resonator to melt and develop holes, which in turn allow water to flood the hull of the Class PWCs.

39. The Exhaust Resonator Defect was present in the Class PWCs when they left the manufacturing facility. Because the Exhaust Resonator Defect is caused by a defect in material, BRP is obligated to cover repairs to the exhaust system during the Limited Warranty and Emissions-Related Warranty periods. Defendants, however, refuse to repair consumers' PWCs under the applicable warranties, refuse to replace the parts free of charge, and refuse to publically acknowledge that the Exhaust Resonator Defect exists. Defendants' refusal to honor

their warranties harms the plaintiffs and Class members by forcing them to incur out-of-pocket costs on covered repairs.

40.     Numerous consumer complaints concerning the Exhaust Resonator Defect in Class PWCs have been voiced on various internet forums as well as directly with BRP. These complaints reflect the abnormal and unexpected Exhaust Resonator Defect and BRP's refusal to honor its warranties, or to take responsibility for the Exhaust Resonator Defect. The complaints also demonstrate BRP's awareness of the defect and how potentially dangerous the defective condition is (note that spelling and grammar mistakes remain as found in the original):

07-20-14, 12:55 PM

## sbaker217

 **GTI SE130 resonator melted!**

My Granddaughter was using my NEW (10hours) GTI SE130 when the intake was clogged by weeds. She got a high exhaust temp message but before she could take appropriate action the ski started to take on water and rapidly started to sink.
Thank God for three young people in a small boat that towed her back to the boat ramp.
Upon lifting the ski from the water, we found that the plastic resonator had a two inch hole in the inlet. This was the cause of the ski taking on water.
We got the ski home and found that the engine had ingested water. We got the water out of the cylinders and I have changed the oil twice.
I still have three fault codes and an indicated ECM fault.
Has this thing happened to others out there and what do I do now? I can't believe that Sea Doo would put plastic components where they could do so much damage.
Looking for advice

This has turned my whole Sea Doo experience quite sour! 

07-20-14, 04:34 PM

## 2014GTI130SEDano

 **Same boat**

Well at least your unit had 10+ hours on it! I got my 2 machines to the lake and had 1 hour on one of them before it sank! it took 10 seconds from the time the flash of exhaust temp high coming on, switching to "Limp mode" and then back to normal (When the exhaust temp sensor melted)

our boat sank to the bottom of the lake and when we got it to shore we see the resonator had blown a hole, another exhaust hose (That ports on the actual can) had pulled right off the port rad hose still intact.

In addition the wear ring straps that hold it in place had blown off and had been sitting in the bottom of the hull

We pulled the boat to shore and when on the trailer checked to see if we had brought anything into the jet. (Nothing) even the dealer said they found nothing in the jet

BRP said that they would not honour warranty and insisted it was because I MUST have had the jet plugged and I would not be a manufacturers defect....

Took me 3 weeks of back and forth to tell them to simply fix it ($1400 CDN)

I feel your frustration and feel that the engine should have shut down to prevent the boat from sinking! poor design in my opinion

https://www.seadooforum.com/showthread.php?72598-GTI-SE130-resonator-melted!

06-23-2015, 12:22 PM

**tc1022**

PWCToday Newbie

Join Date:     Jun 2015
Location:      Florida
Posts:         1

**Seadoo gtx 260 limited // hole in resonator..**

i was on a gtx 260 limited for a matter of minutes and the ski sunk with almost no warning. 5 beeps and the ski was 95% underwater in a very short period of time. (luckily we were in residential water channels & able to swim to safety.) this ski has very few hours and is still under warranty until 5/22/2016. The ski has been impeccably maintained. I contacted brp/sea-doo and they will not admit that there is problem. The resonator literally has a gapping hole in it. Sea-doo is claiming its "rider error" and because the unit over heated it blew a hole in the resonator. I have over 15 years experience with pwc's and i've never seen anything like this. Especially with such short notice. Literally total riding time was no more than 10 minutes and the ski went under. I can't understand how a personal watercraft which is made to float on water, can sink in such a short span of time. There should be some type of safety feature to prevent this from occurring.
Has anyone experienced something like this with the gtx model? I've found a couple other reviews from riders claiming the same thing ... Brp is insinuating that something was lodged in the ski... There definitely wasn't anything in there...that's jet ski 101-check if you "sucked" something up...when the ski got to the dealer the dealer also confirmed that nothing was lodged. Now brp won't cover the repairs...i must say the customer service department at sea-doo/brp really isn't the best.
Have a great day!! Looking forward to comments/suggestions.

http://www.pwctoday.com/showthread.php?t=447101

41.    The undisclosed Exhaust Resonator Defect poses an unreasonable safety risk to

consumers.  These failures can occur without warning and result in the Class PWC sinking in the

middle of a lake, ocean, or any large body of water, thereby stranding the riders, and exposing

them to risk of drowning, hypothermia, exposure, injury from other watercraft, and a myriad of other dangers.

42.     Defendants have long known that the Class PWCs contain the Exhaust Resonator Defect. Defendants' have exclusive access to information about the defects through their dealerships, pre-release testing data, warranty data, customer complaint data, and replacement part sales data, among other sources of aggregate information about the problem. In contrast, the Exhaust Resonator Defect was not known or reasonably discoverable by Plaintiffs and Class members prior to purchase and without experiencing the defect first hand and exposing themselves to an unreasonable safety risk.

43.     Defendants have actively concealed the Exhaust Resonator Defect from consumers. Even when Class PWC owners specifically ask whether their PWC suffers from a known problem, Defendants' policy is to deny that there is a known problem, continue concealing the Exhaust Resonator Defect, and to assert that failure must have been caused by something that the owner did. Defendants knew that potential PWC buyers would deem the Exhaust Resonator Defect to be material such that reasonable consumers who knew of the defect either would have paid less for the Class PWCs or would not have purchased a Class PWC at all.

44.     Defendants owe a duty to disclose the Exhaust Resonator Defect and the associated repair costs to Class PWCs owners, among other reasons, because the defect poses an unreasonable safety hazard; because Defendants have exclusive knowledge or access to material facts about the Class PWCs and their exhaust systems that are not known or reasonably discoverable by Plaintiffs and Class Members; and because Defendants have actively concealed the Exhaust Resonator Defect from its customers.

45.     As a result of Defendants' practices, Plaintiffs and Class members purchased PWCs they otherwise would not have purchased, paid more for those PWCs than they would have paid, were subjected to an unreasonable risk to their safety, and unnecessarily paid, and will continue to pay, repair costs as a result of the Exhaust Resonator Defect.

46.     To this day, upon information and belief, Defendants continues to conceal material information from users and consumers of the Class PWCs and the public that they are inherently and materially defective.

## CLASS ACTION ALLEGATIONS

47.     Plaintiffs bring this lawsuit as a class action individually and on behalf of all others similarly situated as members of the proposed Plaintiff Class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2).   This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

48.     The Class and Sub-Class are defined as:

Nationwide Class: All current and former owners any 2010 to 2016 Sea-Doo PWC.

Florida Sub-Class: All Members of the Nationwide Class who purchased the subject PWCs in the state of Florida.

New York Sub-Class: All Members of the Nationwide Class who purchased the subject PWCs in the state of New York.

49.     Excluded from the Class and Sub-Class are: (1) Defendants, any entity or division in which Defendant has a controlling interest, and its legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; and (3) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiffs

reserves the right to amend the Class and Sub-Class definitions if discovery and further investigation reveal that the Class and Sub-Class should be expanded or otherwise modified.

50.     Numerosity: Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Members of the Class are readily identifiable from information and records in defendants' possession, custody, or control, as well as from records kept by regulatory authorities.

51.     Typicality: The claims of the representative Plaintiffs are typical of the claims of the Class in that the representative Plaintiffs, like all Class Members, purchased a Class PWC that contained the Exhaust Resonator Defect. The representative Plaintiffs, like all Class Members, has been damaged by Defendants' misconduct in that they have purchased a PWC that is worth less than it was purchased for due to the concealed defect.  Plaintiffs have also incurred the cost of repairing the Exhaust Resonator Defect.   Furthermore, the factual bases of Defendants' misconduct are common to all Class Members and represent a common thread of deliberate, fraudulent, misconduct resulting in injury to all Class Members.

52.     Commonality: There are numerous questions of law or fact common to Plaintiffs and the Class that predominate over any questions affecting only individual Class Members. These common legal and factual issues include the following:

   a.  Whether the Class PWCs and their exhaust systems contain defects in material and/or workmanship;

   b.  Whether the fact that the Class PWCs suffer from the Exhaust Resonator Defect would be considered material by a reasonable consumer;

   c.  Whether as a result of Defendants' concealment or failure to disclose material facts, Plaintiffs and Class Members acted to their detriment by purchasing the Class PWCs;

    d.   Whether Defendants were aware of the Exhaust Resonator Defect;

    e.   Whether the Exhaust Resonator Defect constitutes an unreasonable safety risk;

    f.   Whether Defendants have a duty to disclose the defective nature of the Class PWCs and Exhaust Resonator Defect to Plaintiffs and the other Class Members;

    g.   Whether Plaintiffs and the other Class Members are entitled to a declaration as to their rights under the Limited Warranty and Emission-Related Warranty;

    h.   Whether Plaintiffs and the other Class Members are entitled to equitable relief, including but not limited to a preliminary and/or permanent injunction;

    i.   Whether Defendants violated the consumer protection statutes of Florida and New York when it sold to consumers Class PWCs that suffered from Exhaust Resonator Defect.

53.    <u>Adequate Representation</u>: Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions. Plaintiffs have no interests that conflict with other Class Members and Plaintiffs intend to prosecute this action vigorously.

54.    <u>Predominance and Superiority</u>: Plaintiffs and the other Class Members have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendants' misconduct. Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue without remedy. Class treatment of common questions of law and fact would also be superior method to multiple individual actions or piecemeal litigation in that class treatment will

conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

**<u>VIOLATIONS ALLEGED</u>**

**<u>COUNT I</u>**
**BREACH OF EXPRESS WARRANTY**
**(On Behalf of the Nationwide Class or,**
**alternatively, the State Sub-Classes)**

55.     Plaintiffs and the Classes incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

56.     Through their Limited Warranty and Emissions-Related Warranty, Defendants agreed to provide an express written warranty directly to Plaintiff and Class Members, warranting to them that Defendants would repair and/or replace defects in material and/or workmanship free of charge that occurred during the applicable warranty periods.

57.     Defendants breached the Limited Warranty and Emissions-Related Warranty by failing to repair and/or replace Plaintiffs' and other Class Members' defective exhaust systems when they when a proper and timely warranty claim was submitted.

58.     Prior to the filing of this action, Defendants have had ample notice of the Exhaust Resonator Defect. Defendants have been aware of repeated consumer complaints and repair requests, including, but not limited to Plaintiffs', concerning the Exhaust Resonator Defect in the Class PWCs.

59.     Defendants have known of the Exhaust Resonator Defect at least as early as 2010 and continue to have knowledge of the defect and breaches of the express warranties, yet have intentionally failed to notify Plaintiffs and members of the Class.

60.     As a result of the Defendants' actions, Plaintiffs and Class Members have suffered economic damages including but not limited to costly repairs, loss of PWC use, substantial loss in value and resale value of the PWCs, and other related damage.

61.     Defendants' breach of these express warranties caused damages to Plaintiffs and Class Members.

62.     Defendants' attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Defendants' warranty limitations and exclusions are unenforceable because they knowingly sold a defective product without informing consumers about the defect.

63.     The terms of the applicable warranties are also unconscionable and inadequate to protect Plaintiffs and members of the Class. Among other things, Plaintiffs and Class Members had no meaningful choice in determining these limitations and exclusions, the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between Defendants and Class Members, and Defendants knew or should have known that the Class PWCs were defective at the time of sale and would fail under normal use.

64.     Plaintiffs and Class Members have complied with all obligations under the Limited Warranty and Emissions-Related Warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

<u>**COUNT II**</u>
**BREACH OF WRITTEN WARRANTY UNDER THE MAGNUSON MOSS**
**WARRANTY ACT, 15 U.S.C. § 2301 *ET SEQ.***
**(On Behalf of the Nationwide Class or,**
**alternatively, the State Sub-Classes)**

65.     Plaintiffs and the Classes incorporate by reference paragraphs 1-55 as though fully set forth at length herein.

66.     Plaintiff and the other Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

67.     Defendants are "suppliers" and "warrantors" within the meaning of sections 2301(4)-(5).

68.     The Class PWCs are "consumer products" within the meaning of section 2301(1).

69.     Defendants' express Limited Warranty and Emissions-Related Warranty is a "written warranty" within the meaning of section 2301(6).

70.     Defendants breached the express warranties by:

    i.   Extending warranties to Plaintiffs and Class Members with their purchases of the Class PWCs, thereby warranting to repair or replace any part defective in material or workmanship at no cost to the owner, but then refusing to repair or replace the Exhaust Resonator Defect;

    ii.   Selling Class PWCs to Plaintiffs and Class Members with exhaust systems that were defective in material and workmanship, requiring repair or replacement within the warranty periods; and

    iii.   Refusing to honor the express Limited Warranty and Emissions-Related Warranty provided to Plaintiffs and Class Members by repairing or replacing, free of charge, the exhaust system or any of its component parts, including exhaust resonator, and instead charging for repair and replacement parts.

71.     Defendants' breach of the express Limited Warranty and Emissions-Related Warranty has deprived the Plaintiffs and the other Class Members of the benefit of their bargain.

72.     The amount in controversy of the Plaintiffs' individual claims exceed the sum or value of $25. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit as there are there are hundreds, if not thousands, of putative class members

73.     Defendants have been afforded a reasonable opportunity to cure the breaches of written warranties, including when Plaintiffs and other Class Members brought their Class PWCs in for diagnoses and repair of the Exhaust Resonator Defect.

74.     As a direct and proximate cause of Defendants' breach of written warranties, Plaintiff sand Class Members sustained damages and other losses in an amount to be determined at trial. Defendants' conduct damaged Plaintiffs and class members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, rescission, and/or other relief as appropriate.

### COUNT III
### BREACH OF THE IMPLIED
### WARRANTY OF MERCHANTABILITY
### (On Behalf of the Nationwide Class or,
### alternatively, the State Sub-Classes)

75.     Plaintiffs and the Classes incorporate by reference paragraphs 1-55 as though fully set forth at length herein.

76.     Defendants are a "merchants" as defined under the Uniform Commercial Code ("UCC") § 2-104(1). *See* § 672.104(1), Fla. Stat.; N.Y. U.C.C. § 2-104(1).

77.     The Class PWCs and their exhaust systems are "goods" as defined under the UCC § 2-105(1). *See* § 672.105(1), Fla. Stat.; N.Y. U.C.C. § 2-105(1).

78.     Defendants were in privity with Plaintiffs and Class Members. Plaintiff and Class Members were the foreseeable and intended users of the Class PWCs and beneficiaries of Defendants' warranties relating to them.

79.     Defendants impliedly warranted that the Class PWCs and their exhaust systems were of a merchantable quality. *See* UCC § 2-314; § 672.314, Fla. Stat.; N.Y. U.C.C. § 2-314.

80.     Defendants breached the implied warranty of merchantability, as the Class PWCs were not of a merchantable quality due to the Exhaust Resonator Defect, and the associated problems caused by this defect.

81.     As a direct and proximate result of the breach of said warranties, Plaintiffs and class members were injured, and are entitled to damages.

82.     Plaintiffs and Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

**COUNT IV**
**VIOLATION OF THE FLORIDA**
**DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**(On Behalf of the Florida Sub-Class)**

83.     Plaintiffs and the Florida Sub-Class incorporate by reference paragraphs 1-55 as though fully set forth at length herein.

84.     This is an action for actual damages and injunctive relief or declaratory relief pursuant to Chapter 501, Part II, Fla. Stat., the "Florida Deceptive and Unfair Trade Practices Act" ("FDUTPA").

85.     The purpose of FDUTPA is "to protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or

unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."
§§ 501.202, Fla. Stat.

86.     At all times material, Plaintiffs and Class Members were "consumers" within the meaning of FDUTPA, and Defendants have engaged in "trade or commerce" within the meaning of FDUTPA. §§ 501.203 (7)-(8), Fla. Stat.

87.     Section 501.204(1) of FDUTPA imposes a duty on Defendants to refrain from engaging in "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

88.     Section 501.211 of FDUTPA provides consumers with a private right of action for FDUTPA violations.

89.     The Exhaust Resonator Defect was and is material and would likely affect a consumer's purchase and repair decisions regarding the Class PWCs. The Exhaust Resonator Defect causes the Class PWCs to fail entirely.  These failures can occur without warning and result in the Class PWC sinking in the middle of a lake, ocean, or any large body of water, thereby stranding the riders, and exposing them to risk of drowning, hypothermia, exposure, injury from other watercraft, and a myriad of other dangers. Nonetheless, Defendants completely failed to warn or advise its customers, including Plaintiffs and Class Members of the Exhaust Resonator Defect.

90.     Because Exhaust Resonator Defect was hidden and Defendants failed to disclose it, Plaintiffs and Class Members had no reasonable way to avoid their injuries.

91.     As set forth above, despite having prior and repeated notice of the above-described Exhaust Resonator Defect, Defendants have engaged in a routine, albeit wrongful course of conduct, in that they:

a. Manufactured, sold, distributed, and advertised and continued to manufacture, sell, distribute, and advertise Class PWCs that were unsafe, when Defendants knew or should have known such was the case and could have remedied the Exhaust Resonator Defect, but didn't;

b. Manufactured, sold, distributed, and advertised and continued to manufacture, sell, distribute, and advertise Class PWCs with a defect that was material, and caused engine and engine component failure or substantially increased the likelihood of engine failure, when Defendants knew or should have known such was the case and could have remedied the Exhaust Resonator Defect, but didn't;

c. Systematically failed to disclose to and warn Plaintiffs and Class Members that the Class PWCs had a material defect that causes premature engine failure or the substantial risk or excessive propensity of engine or engine component failure;

d. Continued to manufacture, market, advertise, distribute, and sell the Class PWCs to consumers with an express written warranty attempting to disclaim all implied warranties, when it knew that the Class PWCs were not fit for their ordinary uses purposes, and would not withstand normal operation;

92.    By engaging in the foregoing course of conduct, Defendants have caused consumers, including Plaintiffs and Class Members, to be aggrieved and suffer ascertainable losses and damage, in that, among other things, Defendants' wrongful course of conduct systematically:

a. Caused Plaintiffs and the Class Members to pay premium prices for a defective product; pay a greater price for a product than they would have; or to pay for a

product they entirely would not have purchased had they been warned or advised about the defect; and,

b. Reduced the value of the Class PWCs purchased by Plaintiffs and Class Members.

93.     Based on the foregoing, Defendants have engaged in representations, acts, practices or omissions that are material, and that are likely to mislead consumers acting reasonably under the circumstances. Thus, Defendants have engaged in deceptive acts or practices in violation of § 501.204(1), Florida Statutes.

94.     Moreover, based on the foregoing course of conduct, Defendants have committed acts or practices in trade or commerce which offend established public policy and are unethical, oppressive, unscrupulous or substantially injurious to consumers; or Defendants have committed acts or practices which have caused, or are likely to cause, consumer injury, which is substantial, not outweighed by any countervailing benefits to consumers or competition that the practice produces, and an injury that consumers themselves could not reasonably have avoided. Therefore, Defendants have engaged in unfair acts or practices in violation of Section 501.204(1), Florida Statutes.

95.     As a result of these unfair and deceptive acts, Defendants have caused Plaintiffs and Class Members suffer losses and be aggrieved and thus incurred actual damages or are entitled to injunctive relief and/or declaratory relief as a result of Defendants' unfair or deceptive acts or practices in violation of FDUTPA, in an amount or extent to be determined at trial.

**COUNT V**
**Violations of the New York Consumer Protection Act ("NYCPA")**
**N.Y. Gen. Bus. Law § 349**
**(On behalf of the New York Sub-Class)**

96.     Plaintiffs and the New York Sub-Class incorporate by reference paragraphs 1-55 as though fully set forth at length herein.

97.     Plaintiffs bring this count on behalf of themselves and members of the New York Sub-Class.

98.     Plaintiffs and members of the New York Sub-Class are permitted to bring this action for injunctive relief and actual damages under the NYCPA.  *See* N.Y. Gen. Bus. Law § 349(h).

99.     Defendants are engaged in the conduct of "business, trade or commerce" within the meaning of the NYCPA.  *See* N.Y. Gen. Bus. Law § 349(a).

100.    The NYCPA prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service."  *See* N.Y. Gen. Bus. Law § 349(a).

101.    Defendants violated the NYCPA by engaging in deceptive acts or practices directed to consumers in connection with the sale of the Class PWCs.

102.    Defendants knowingly concealed, suppressed and/or omitted material facts regarding the defective exhaust system and its corresponding safety risk, and misrepresented the standard, quality or grade of the Class PWCs, which directly caused harm to Plaintiffs and members of the New York Sub-Class.  Plaintiffs and members of the New York Sub-Class could not reasonably have known about the Exhaust Resonator Defect and its corresponding safety risk as the information was in the superior and exclusive control of Defendants.

103.    Defendants intentionally and knowingly misrepresented and concealed, suppressed and/or omitted facts regarding the Exhaust Resonator Defect with the intent to mislead Plaintiffs and members of the New York Sub-Class.  Defendants knew, or should have known, that the Exhaust Resonator Defect was a latent defect and would not be discovered until

after purchase, and even when discovered, it would not be covered under warranty. Defendants also knew, or should have known, that the Exhaust Resonator Defect in the Class PWCs could cause catastrophic failure leading to a loss of engine power while the PWC was operating. Further, Defendants knew, or should have known, that the Class PWCs could sink, putting operators, passengers, and other individuals at risk for injury.

104.    Defendants owed a duty to disclose the Exhaust Resonator Defect and its corresponding safety risk to Plaintiffs and members of the New York Sub-Class because they possessed superior and exclusive knowledge regarding the defect and the risks associated with the defect. Rather than disclose the defect, Defendants engaged in deceptive acts or practices in order to sell additional Class PWCs and wrongfully transfer the cost of repair or replacement of the Exhaust Resonator Defect to Plaintiffs and members of the New York Sub-Class.

105.    Defendants' deceptive acts or practices, affirmative misrepresentations and/or material omissions regarding the Exhaust Resonator Defect were intended to mislead consumers, were misleading to reasonable consumers, and misled Plaintiffs and members of the New York Sub-Class.

106.    At all relevant times, Defendants' deceptive acts or practices, affirmative misrepresentations and/or omissions regarding the Exhaust Resonator Defect and its corresponding safety risk were material to Plaintiffs and members of the New York Sub-Class. When Plaintiffs and members of the New York Sub-Class purchased their Class PWCs, they reasonably relied on the reasonable expectation that the Class PWCs exhaust systems were free from latent defects and if a defect in material or workmanship manifested during the warranty period it would be repaired free of charge. Had Defendants disclosed that the exhaust system was prone to premature failure and/or an unavoidable safety risk, Plaintiffs and members of the

25

New York Sub-Class would not have purchased the Class PWCs, or would have paid less for them.

107.    Defendants had a continuous duty to Plaintiffs and members of the New York Sub-Class to refrain from unfair and deceptive practices under the NYCPA and to disclose the Exhaust Resonator Defect.    Defendants' deceptive acts or practices, affirmative misrepresentations and/or material omissions regarding the Exhaust Resonator Defect and corresponding safety risk are substantially injurious to consumers.  As a result of Defendants' knowing, intentional concealment, suppression and/or omission of the Exhaust Resonator Defect in violation of the NYCPA, Plaintiffs and members of the New York Sub-Class have suffered harm and/or continue to suffer harm by the threat of sudden and unexpected failure of the exhaust system and/or actual damages in the amount of the cost to repair the Exhaust Resonator Defect, and damages to be determined at trial.  Owners and lessees of Class PWCs also suffered an ascertainable loss in the form of the diminished value of their PWCs as a result of Defendants' deceptive acts or practices in the course of their business.

108.    Defendants' deceptive acts or practices occurred in the conduct of business, trade or commerce.

109.    Defendants have knowingly and willfully engaged in the deceptive acts or practices alleged herein.   Further, Defendants unconscionably marketed the Class PWCs to uninformed consumers in order to maximize profits by selling additional Class PWCs containing the undisclosed latent defect and corresponding safety risk.

110.    Defendants' deceptive acts or practices affect the public interest and present a continuing safety risk to Plaintiffs and members of the New York Sub-Class as well as the public.

111.    As a direct and proximate result of Defendants' violations of the NYCPA, Plaintiffs and members of the New York Sub-Class have suffered actual damages and/or injury in fact.

112.    As a result of Defendants' unlawful conduct, Plaintiffs and members of the New York Sub-Class are entitled to actual damages, treble damages, costs of litigation, attorneys' fees, injunctive and other equitable relief.  *See* N.Y. Gen. Bus. Law § 349(h).

**COUNT VI**
**BREACH OF THE DUTY OF GOOD FAITH**
**AND FAIR DEALING**
**(On Behalf of the Nationwide Class or,**
**alternatively, the State Sub-Classes)**

113.    Plaintiffs and the Classes incorporate by reference paragraphs 1-55 as though fully set forth at length herein.

114.    For every contract, the common law implies a covenant of good faith and fair dealing between parties in performing and enforcing their contractual duties. *See* Restatement (2d) of Contracts §205 (1981).  Under this covenant, each party to a contract has a duty to refrain from doing anything to unfairly interfere with the rights of any other party to receive the intended benefits of the contract. *Id.* Good faith and fair dealing includes the duty to exercise one's discretion in carrying out the contract in good faith and duty to act in a commercially reasonable manner.

115.    Through selling and warranting PWCs to Plaintiffs and Class Members, Defendants have entered contracts with them.  Each of these contracts contains an implied covenant of good faith and fair dealing.

116.    In carrying out their contracts with Plaintiffs and Class Members, Defendants failed to act in good faith or in a commercially unreasonable manner, denying Plaintiffs and

Class Members some benefit of the bargain originally intended by the parties by, *inter alia*, failing to notify Plaintiffs and Class Members of the Exhaust Resonator Defect in the Class PWCs, misrepresenting the cause of the Exhaust Resonator Defect when the Class PWCs presented to authorized dealerships for repairs, misrepresenting the scope of the applicable warranties and failing to fully and properly repair this defect under warranty.

117.    Through the foregoing, Defendants breached the covenant of good faith and fair dealing, thereby causing Plaintiffs and Class Members injuries in an amount to be determined at trial.

**COUNT VII**
**UNJUST ENRICHMENT**
**(On Behalf of the Nationwide Class or,**
**alternatively, the State Sub-Classes)**

118.    Plaintiffs and the Classes incorporate by reference paragraphs 1-55, with the exception of those paragraphs addressing the written warranties, as though fully set forth at length herein.

119.    This cause of action is brought in the alternative, and will only be pursued if it is determined that no valid contracts and/or warranties exist between the Class and Defendants.

120.    As a direct and proximate result of Defendants' failure to disclose known defects and material misrepresentations regarding known defects in the Class PWCs, Plaintiffs and Class Members have incurred substantial costs to repair the Class PWCs, which requires the replacement of the defective parts with replacement defective parts also sold by Defendants. As a result of having to prematurely purchase these replacement parts as a result the Exhaust Resonator Defect, Plaintiff and Class Members have conferred an unjust substantial benefit upon Defendants.

121.     Moreover, as a direct and proximate result of Defendants' failure to disclose known defects and material misrepresentations regarding known defects in the Class PWCs, Defendants have profited to the extent that Plaintiffs and Class Members purchased Defendants' PWCs, purchased certified parts directly from the Defendants to repair the defects, and had to pay for repairs out of their own pocket that should have been covered under the applicable warranties.

122.     Defendants have therefore been unjustly enriched due to the known defects in the Class PWCs through the use of funds that earned interest or otherwise added to Defendants' profits when said money should have remained with Plaintiffs and Class Members.

123.     As a result of the Defendants' unjust enrichment, Plaintiffs and Class Members have suffered damages.

## COUNT VIII
## DECLARATORY JUDGMENT
**(On Behalf of the Nationwide Class or,
alternatively, the Florida Sub-Class)**

124.     Plaintiffs and the Classes incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

125.     Defendants interpret and apply its Limited Warranty and Emissions-Related Warranty to exclude coverage for damages caused by the Exhaust Resonator Defect.

126.     Plaintiffs contend that these warranties cover defects in material and workmanship, such as the Exhaust Resonator Defect, an interpretation driven by the plain language of the warranties.

127.     Plaintiffs on behalf of the Class, requests a declaration as to the parties' respective rights of the Limited Warranty and Emissions-Related Warranty.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class, respectfully requests that this Court:

a.      enter an order certifying the proposed Class and/or Sub-Classes, designating Plaintiffs as named representatives of the Classes, and designating the undersigned as Class Counsel;

b.      declare that Defendants are financially responsible for notifying all Class Members about the Limited Warranty and Emissions-Related Warranty;

c.      enter an order enjoining Defendants (i) from further deceptive marketing, warranting and sales practices with respect to Class PWCs, and (ii) to remove and replace Plaintiffs and Class Members' exhaust systems with a suitable alternative product;

d.      award to Plaintiffs and the Class compensatory, exemplary, statutory damages, treble and punitive damages, including interest, in an amount to be proven at trial;

e.      award any and all remedies provided pursuant to the FDUTPA and NYCLA;

f.      declare that Defendants must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale of the Class PWCS, the repairs made to Class PWCs and the sale of replacement parts, or make full restitution to Plaintiffs and Class Members;

g.      enter a declaration regarding the rights under the Limited Warranty and Emissions-Related Warranty;

h.      award of attorneys' fees and costs, as allowed by law;

i.      award of pre-judgment and post-judgment interest, as provided by law;

j.      grant leave to amend the Complaint to conform to the evidence produced during discovery and at trial; and

k.      such other relief as may be appropriate under the circumstances.

### <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a trial by jury on all claims and issues so triable.

Dated: June 7, 2017                              Respectfully submitted,

*/s/ Steven R. Jaffe*
Steven R. Jaffe (FBN 390770)
Email: steve@pathtojustice.com
Mark S. Fistos (FBN 909191)
E-mail: mark@pathtojustice.com
**FARMER, JAFFE, WEISSING, EDWARDS
FISTOS & LEHRMAN, P.L.**
425 North Andrews Avenue, Suite 2
Fort Lauderdale, FL 33301
Telephone: 954-524-2820
Facsimile: 954- 524-2822

Matthew R. Mendelsohn (*pro hac vice* forthcoming)
E-mail: mmendelsohn@mskf.net
**MAZIE SLATER KATZ & FREEMAN, LLC**
103 Eisenhower Parkway
Roseland, NJ 07068
Telephone: 973-228-9898

Richard E. Norman (*pro hac vice* forthcoming)
E-mail: rnorman@crowleynorman.com
R. Martin Weber, Jr. (*pro hac vice* forthcoming)
E-mail: mweber@crowleynorman.com
**CROWLEY NORMAN, LLP**
3 Riverway, Suite 1775
Houston, Texas 77056
Telephone: 713-650-1771

Britton D. Monts (*pro hac vice* forthcoming)
E-mail: bmonts@themontsfirm.com
**THE MONTS FIRM**
Frost Bank Tower
401 Congress Ave., #1540
Austin, TX 78701
Telephone: 512-474-6092

*Attorneys for Plaintiffs and Putative Class*